# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-14-00003-CV
---

**J. D., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---
**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT**
**NO. 257,875-B, HONORABLE JACK WELDON JONES, JUDGE PRESIDING**
---

## M E M O R A N D U M   O P I N I O N

Based on jury findings, the trial court terminated J.D.'s parental rights to his son, G.W.[1] Appellant raises four issues on appeal challenging the legal and factual sufficiency to support the jury findings that underlie the termination. We will affirm the judgment.

### STANDARD OF REVIEW

The parent-child relationship can be terminated if there is clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001. When multiple statutory

---

[1] This case at one time concerned the parental rights to four boys born to W.W. and three different fathers. W.W. eventually relinquished her rights to G.W. and another son. Her parental rights are not at issue on this appeal, nor are those of the other presumed or alleged fathers. This case proceeded to trial only as to appellant's parental rights.

W.W. regained custody of her other two sons under a monitored return. According to appellant, the Department thereafter removed those children and sought termination of her parental rights to those children, alleging that W.W. violated the terms of that return.

grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if it is supported by any of the statutory grounds alleged. *Spurck v. Texas Dep't of Family & Prot. Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.)

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the factfinder's determination and will uphold a finding if a reasonable factfinder could have formed a firm conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the jury resolved disputed facts in favor of its finding if it could reasonably do so. *Id.* We disregard evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

When reviewing the factual sufficiency of the evidence in a parental termination case, we view all of the evidence in a neutral light and determine whether a reasonable factfinder could form a firm belief or conviction that a given finding was true. *In re C.H.*, 89 S.W.3d 17, 18-19 (Tex. 2002). We assume that the jury resolved disputed facts in favor of its finding if a reasonable jury could do so, and we disregard evidence that a reasonable jury could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if that disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## DISCUSSION

The trial court submitted a single broad-form question asking the jury whether appellant's parental rights to G.W. should be terminated. The court instructed the jury that the parental relationship could be terminated only if the jury found by clear and convincing evidence that termination was in the child's best interest and that one of the following events occurred: (1) appellant engaged in conduct or knowingly placed G.W. with persons who engaged in conduct that endangered G.W.'s physical or emotional well-being; (2) appellant failed to support G.W. in accordance with his ability in the relevant period; or (3) appellant constructively abandoned G.W. *See* Tex. Fam. Code § 161.001(1)(E), (F), (N), (2).

Evidence supporting the first ground arose before G.W.'s birth. Appellant met G.W.'s mother, W.W., when they both lived in South Carolina and she was pregnant with one of G.W.'s older brothers. He testified that later, after he learned that W.W. was pregnant with his child, G.W., she came to live with him and his mother in New York City. He testified that problems soon arose:

> She—because she said she wanted me to baby-sit her kids at that time while she sleep, and she was just too nasty for me. What I mean "nasty"—her hygiene, the way she was taking care of the kids was unacceptable to me, and I just couldn't take her no more, and I just told her I wanted to go my separate ways.

W.W. went to live with her brother in Kansas, where in June 2006 she gave birth to G.W.[2] Appellant did not visit G.W. during the two years he lived in Kansas. W.W. moved back to

---

[2] G.W.'s caseworker testified that he was "in care" while in Kansas (without stating a reason) and in Massachusetts after an allegation that one of G.W.'s brothers was sexually abused. There is no evidence that appellant was aware of the Kansas removal. Appellant testified that he thought G.W. was "in care" in Massachusetts.

New York City in 2008 and soon thereafter her children were removed from her after one of them was burned with an iron while being watched by a teenaged neighbor. Appellant testified that the children were then in foster care for a year and a half and that, during the pendency of the removal, he went to one court hearing. He also said he visited G.W. in foster care with W.W. almost weekly for about a year until he felt that his arguments with W.W. were too distracting. He said he did not intervene in the court proceeding because he felt that conflict with the mother was going to "be a distraction" from the mother regaining custody and be contrary to his son's wishes and best interest.[3] When New York restored custody of her four children to W.W., she moved with the children to Massachusetts in May 2011. Appellant testified that he lost touch with W.W. shortly thereafter. In 2012, W.W. sent the children to live with relatives in Texas, asserting that she would follow soon after. When it became apparent that W.W. was not coming, the relatives called the Department. In June 2012, the Department initiated this proceeding. Appellant testified that he believed that G.W. was in Massachusetts until April 2013, when he learned that G.W. was in Texas from a nephew who was Facebook friends with W.W.

Appellant then contacted the caseworker, who advised him regarding steps he could take to stave off termination. In May 2013, the trial court granted the maximum six-month extension of this proceeding. Appellant interacted with G.W. once through the Texas caseworker. At her prompting, he exchanged texted photos with the seven-year-old G.W., who did not recognize him.

---

[3] The record contains criminal history for appellant. During 2008-09, appellant was arrested three times for having cigarettes lacking required tax stamps, once for petty larceny, and once for criminal mischief. These followed his August 2007 arrest for marijuana possession. He had other criminal history through the 1990s, plus a robbery and burglary charge in 1985 that led to a two-year prison term. He also had verbal confrontations with his wife—not G.W.'s mother—in 2011 and 2012 that led him to call the police, and his wife called the police in 2012 charging him with grand larceny of some of her jewelry.

4

He did not visit or attend court hearings, citing the expense of travel and lodging, and did not participate in the court hearings or mediation. He participated in the trial by telephone.

G.W.'s caseworker and guardian ad litem described G.W. as a sweet and gentle, but also angry, troubled, and confused boy. They said that he was intelligent and could bond with others, but was subject to fits of anger in which he would hit his teachers, classmates, and brothers. They said that the brothers knew how to trigger each other's anger and did so. Although the brothers were initially placed with a foster family trained to deal with challenging children, G.W. was eventually moved to a residential treatment center to focus on his issues. The Department's witnesses testified that G.W.'s problems likely stemmed from his unstable surroundings during his life. The guardian ad litem testified that, although appellant may not have directly created the unstable environment, he is a cause of it through omission by allowing G.W. to remain in such an environment with the child's mother.

Appellant denied responsibility for G.W.'s situation. He never paid child support, though he said he did provide W.W. with money when he could. His income was limited to monthly $797 disability payments, which he said were paid due to depression, bad knees, high cholesterol, and asthma. Appellant argues that he did not endanger G.W. personally and did not knowingly place him with someone who did. He asserts that G.W.'s mother severed contact with him and that he was unaware of his child's surroundings. He relies on a case in which a court of appeals reversed the termination of the parental rights of a prisoner who was estranged from the mother of his children and was unaware of the conditions in which the mother placed the children after his imprisonment. *In re K.W.*, 138 S.W.3d 420, 432 (Tex. App.—Fort Worth 2004, pet. denied). He also notes that, despite the removals and other interventions, state authorities always returned the children to

W.W. Even in this case terminating W.W.'s rights to G.W. based on her relinquishment, her positive drug tests, and her other history, the Department returned two of her sons to her custody, indicating that she was not an unfit parent. The caseworker testified that W.W. had tried to improve her parenting skills.

Legally and factually sufficient evidence supports the jury's implied finding that appellant knowingly placed G.W. with someone whose conduct endangered G.W.'s physical or emotional well-being. G.W. has emotional problems and engages in physical violence, issues that witnesses attributed to the environments in which W.W. raised him. Appellant himself testified that while W.W. lived with him before G.W.'s birth, her "hygiene and the way she was taking care of the kids was unacceptable." In response, he "went [his] separate way" while he knew she was pregnant with G.W. Appellant did not seek visitation, much less custody, then or at any time during G.W.'s seven years of life until this proceeding. He did not see G.W. after he was born and did not investigate whether W.W.'s parenting continued to be "unacceptable." Appellant did not challenge W.W.'s custody when she returned to New York City, even after G.W. was removed from her care after another of her children was injured. Appellant testified that the children were not placed with him because W.W. "objected." W.W. broke off contact with appellant after moving to Massachusetts—which appellant testified occurred when the children were removed from her care in New York—and still he did not seek to remove G.W. from her care through official processes or informal offer. Viewing the record in the proper light, we conclude that factually and legally sufficient evidence supports the jury's finding that there was clear and convincing evidence that appellant knowingly placed G.W. with someone who endangered his physical and emotional well-being.

6

Because we have found the evidence sufficient to support one ground for termination, we need not address the remaining grounds for termination. *See Spurck*, 396 S.W.3d at 221.

**Best interest of the child**

In a parental rights termination case, the best interest of the child is assessed using a non-exhaustive list of factors. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The nine, non-exhaustive *Holley* factors are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omission committed by the parent which may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions committed by the parent. *Holley*, 544 S.W.2d at 371-72. The Department need not prove all nine *Holley* factors. *C.H.*, 89 S.W.3d at 27. We will discuss evidence relating to the *Holley* factors relevant to this case.

G.W. did not testify regarding his wishes. G.W.'s foster home counselor said G.W. did not talk about his dad or even knew him. The caseworker said that G.W. did not recognize appellant in a picture, did not ask to call him, and did not mention him. G.W.'s guardian ad litem said that G.W. wants to move on and be adopted into a safe, stable home.

The Department's witnesses testified that G.W. should be released from the residential treatment center within months, though no particular timetable was set. After that, G.W.

7

will need a highly structured environment with people who understand his need for boundaries and notice when he is getting upset and when others are pushing his buttons.

There is not much evidence of appellant's parenting abilities. He has five grown children who he says he raised and stayed involved in their lives even though he did not live with their mothers. Three were involved with state child-protection authorities because, according to appellant, their mothers abandoned them. Those children did not come to live with him, but he said he stayed involved in their lives "to some extent." Appellant asserts that he can provide for G.W.'s needs. Although appellant was staying in his mother's living room, he said he planned to get an apartment with his fiancee that could accommodate her children and G.W. He anticipated accessing government services that G.W. would need.

The Department said it had a prospective adoptive family lined up, although the family had not been certified as a foster home or an adoptive placement. The proposed parents are a retired military father and nurse mother who run a licensed in-home day-care. They have grown children. They knew G.W.'s foster family through church and had known G.W. for a year through that interaction. The Department planned for G.W.'s oldest brother to be adopted by another family from the same church, so the boys would be near each other and in contact but not in the same house, which G.W.'s caseworker described as best for G.W. The Department acknowledged that the adoption was not certain because the proposed adoptive parents might not be approved or could conceivably change their minds.

G.W.'s guardian ad litem opined that appellant had not shown any change in his priorities in favor of G.W. despite knowing that their familial relationship was at stake. In two phone calls, appellant did not ask for help and did not ask how G.W. was doing. He testified

that appellant is responsible for G.W.'s situation because he knew that G.W.'s environment was unacceptable and yet allowed him to remain in it. Appellant testified that he did not know whether he could talk to G.W. so he did not ask. The guardian ad litem testified that termination was in G.W.'s best interest.

Viewing the record in the proper light, we conclude that the record contains legally and factually sufficient evidence to support the jury's finding by clear and convincing evidence that termination of appellant's parental rights is in G.W.'s best interest.

## CONCLUSION

We affirm the judgment terminating appellant's parental rights to his son, G.W.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: April 24, 2014